IN THE DISTRICT COURT OF THE SOUTHERN DISTRICT OF FLORIDA,

FT PIERCE DIVISION

Joseph Ransberger,                          Case#    20-14295-CIV-MIDDLEBROOKS/REID

    Plaintiff

v.

Okeechobee County; Fla. Dept. of. Corrections; Sgt. Aguilar; Lt. Whitlon;

Lt. Campbell; Sgt Robbins; Sgt. Warren; Ofc. Fiedler; Ofc. Hawk; Ofc. Bevis;

Classification Ofc. Collins; Sgt. Anglin; Doctor Bhadja; Assistant Warden Scott;

Assistant Warden Siegler; Warden Severson; B. Baker; John Doe;

    Defendants

_____/

FILED BY _____ D.C.

AUG 2 4 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

VERIFIED COMPLAINT WITH JURY DEMAND

COMES NOW, the plaintiff, Joseph Ransberger, *Pro se,[1] Ad hoc,* pursuant to 42 U.S.C 1983, respectfully requesting for this honorable court to grant relief for violations of the First, Eighth, and Fourteenth Amendments of the United States Constitution, committed by the defendants under color of federal law. In support of this complaint, the plaintiff (hereinafter Mr. Ransberger) presents as follows:

cat / div _____
Case # _____
Judge _____Mag _____
Motn Ifp ____ Fee pd $ _____
Receipt # _____

---

[1] The plaintiff requests liberal interpretation of this complaint as a *pro se* litigant pursuant to *Haines v. Kerner*, 404 U.S. 519 (1972). *See, e.g., Tannenbaum v. United States*, 148 F.3d 1262 (11th Cir. 1998) (*per curiam*).

## PRELIMINARY STATEMENT

This is the story of a first-time felon with no criminal history that arrived at the worst prison in South Florida and chose not to back down from the abuse and corruption that has been taking place at O.C.I. for years.

The facts of this case go back for years since the beginning of Mr. Ransberger's arrival at O.C.I., and many facts are stated to shed light on the continuing corruption at O.C.I., regardless of their relevancy.

For ease of reference, and for procedural purposes, each claim will be discussed in isolation below.

Mr. Ransberger's case is a classic case of retaliation by each correctional official listed above for participating in his First Amendment right to file grievances for each problem that arised throughout the course of his time served at O.C.I.

These retaliation efforts by each officer involved evinced that it was more than retaliation, it was an ongoing conspiracy to silence Mr. Ransberger from bringing this corruption to the light: a conspiracy that is illuminated by the record of events that have occurred at O.C.I in the past years, even way before Mr. Ransberger's arrival.

This conduct by these correctional officers ultimately ended up affecting Mr. Ransberger's right to access to the courts, and to medical attention for all his medical needs, in violation of the Eighth Amendment.

The cumulative effects of the violations amounted to multiple due process violations, in violation of the Fourteenth Amendment.

Further, the continued conduct also contributed and continues to contribute to Mr. Ransberger's credible fear of imminent danger, which presents life threatening situations due to his bad health problems and security issues that are exacerbated as the days go by.

Due to the amount of time that has elapsed, and the dangerous nature of these claims, Mr. Ransberger is also moving this honorable court for a preliminary injunction for protection from further retaliation and fatal lung/respiratory damage

during the initial resolution of this lawsuit; this motion will be filed simultaneously with this lawsuit.

Additionally, a collection of exhibits and sworn affidavits are included in this lawsuit to corroborate the claims raised, and to prove the constant attempts to expose the pattern of corruption throughout the years leading up to the events described in this lawsuit.

## JURISDICTION & VENUE

This court has jurisdiction to hear these claims pursuant to 28 U.S.C. 1331(1), and 1343, based on federal questions related to the U.S. Constitution. *See Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 188 (1971).

Venue is appropriate because all the defendants listed above are employees at Okeechobee Correctional Facility and the Work Camp, which is within the district boundaries for this court and because all the incidents set forth in this complaint transpired at Okeechobee Correctional Facility and Okeechobee Work Camp.

Any others that might become part of this lawsuit also work there and will be determined via discovery.

This court also has supplemental jurisdiction over Mr. Ransberger's state tort law claims under 28 U.S.C 1367.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

For exhaustion purposes, each level of exhaustion on administrative levels in the institution has been exhausted to no avail, in accordance with the Prison Litigation Reform Act (PLRA), pursuant to 42 U.S.C. 1997 (e), *et. sequentia; see also* 28 U.S.C. 1915 (g). Most importantly, the dangerous nature of the situation at bar presents a real imminent fear of danger, grave harm, and or death- circumstances that warrant review by this honorable court to review this complaint on its merits, without applying any possible procedural bars. *Ibid.*

## PARTIES

Mr. Ransberger was incarcerated at the Okeechobee Correctional Institution (O.C.I.) during all the events described in this complaint and is the plaintiff in this 1983 action.

Okeechobee County, as an entity,[2] where all the events transpired and where correctional and medical staff followed policies and customs, being sued in its official capacity.

Defendant Warden Severson (hereinafter Severson), a correctional Warden, is being sued in his individual capacity.

Defendant Assistant Warden Scott (hereinafter Scott), a correctional Asst. Warden, is being sued in her individual capacity.

Defendant Assistant Warden Siegler (hereinafter Siegler), a correctional Asst. Warden, is being sued in his individual capacity.

Defendant Sgt. Aguilar (hereinafter Aguilar) is a correctional officer, being sued in his individual capacity.

---

[2] *See Monell v. Department of Social Services,* 436 U.S. 658 (1978); *accord Lozman v. City of Riviera Beach,* 138 S.Ct 1945, 1951 (2018) (quoting *Monell* and holding that a *Monell* claim cannot be executed unless the harm was caused in the implementation of "official municipal policy.").

Defendant Lt. Whitlon (hereinafter Whitlon) is a correctional officer, being sued in his individual capacity.

Defendant T. Fiedler (hereinafter Fiedler) a correctional officer working as legal mail staff, being sued in her individual capacity.

Defendant Sgt. Robbins (hereinafter Robbins) is a correctional officer, being sued in her individual capacity.

Defendant Ofc. Hawk is a correctional officer, being sued in her individual capacity.

Defendant Ofc. Collins (hereinafter Collins), is a classification officer, being sued in her individual capacity.

Defendant Dr. Bhadja (hereinafter Bhadja), a doctor employed by Centurion medical company, is being sued in his individual capacity.

Defendant Lt. Campbell (hereinafter Campbell), is a correctional officer, being sued in his individual capacity.

Defendant Ofc. Bevis (hereinafter Bevis), a corrections mail room officer, is being sued in her individual capacity.

Defendant B. Baker (hereinafter Baker), a medical staff member employed by Centurion, being sued in his individual capacity.

Defendant John Doe (hereinafter Doe), an unknown individual, being sued in his/her individual capacity.

---

## FACTUAL SUMMARY

In 2014, Mr. Ransberger, a first-time offender, arrived at O.C.I. and began serving his sentence in general population.

After a short period of time at the main unit, Mr. Ransberger was moved to the work camp, where many of the events took place.

When Mr. Ransberger was assigned to the outside work squad, Robbins did not allow him or her inmates to take bathroom breaks as needed, drink water as needed, and would forget to bring the inmates their bag lunches to eat while working under the sun on outside grounds.

Robbins also admitted to taking Xanax during work hours, and confessed to her own problems with psychosis; she would use these personal problems as excuses to explode on inmates and mistreat them at any given time whenever they were not working up to her standards.

When Mr. Ransberger wrote a grievance concerning these issues about Robbins, the negative events began to happen in sequence, creating a pattern of hostile behavior, disdain, and retaliation from different officers.

Soon after Mr. Ransberger filed the grievance on Robbins, one day Robbins waited for everyone to gather at the basketball court before work to tell all the inmate work squads out loud that it was "Mr. Ransberger's  fault that they could not get their legal mail that day."

This caused multiple threats from inmates and gang members ordering Mr. Ransberger to stop filing grievances on staff. *See* Security Timeline.

Shortly thereafter, Campbell spoke to Mr. Ransberger in private and told him that is was him who fired him from the tool room position, in attempts to cover for Robbins unfounded retaliatory actions.

This proves Campbell had actual knowledge of Robbins ongoing issues with Mr. Ransberger and conspired along with them to retaliate on him as well.

In response to those actions by corrections staff, Mr. Ransberger continued writing grievances, creating this paper trail that vividly illustrates the pattern of retaliatory behavior behind Campbell, Robbins, Bevis, Fiedler, and Warren's conspiracy to get back at Mr. Ransberger.

In her attempts to cover up for Robbins, Warren disposed of 2 DC1-303's that Mr. Ransberger filed on Robbins when Warren answered Mr. Ransberger's other requests for production of documents. *See* appeal# 1910-404-001.

In addition to this, Ms. Bevis sent an inmate after Mr. Ransberger to bring him to the lieutenant's office and interrogate him about the warehouse legal mail issue he wrote the grievance about.

At another moment, Mr. Coffey also confirmed that Fiedler stopped Mr. Ransberger from going to the warehouse to get his legal mail because she said that he was writing grievances about officers sexually abusing him. *See* Mail Room Grievance Timeline.

After interrogating and threatening Mr. Ransberger about the grievance, Ms. Bevis told another inmate waiting to send legal mail that "he can thank inmate Ransberger for you not being able to send legal mail through the warehouse." *Id.*

These concerted efforts by Bevis and others were calculated to arouse the inmate population against Mr. Ransberger for writing grievances on them.

On 3/6/19, Mr. Ransberger had an incident in which a DR was issued for disorderly conduct at the work camp. *See* Exhibit A, Fla. D.O.C. Disciplinary Report (log#407-190077) *see also* Mail Room Grievance Timeline.

When Mr. Ransberger reported to the lieutenant's office for legal mail, Fiedler got into an argument with Mr. Ransberger regarding his mail, then falsely accused him of disorderly conduct in order to send him to confinement.

Even though another Sgt. (Vidal) was outside the office where the alleged disorderly conduct took place, he was not called in to stop Mr. Ransberger from what Fiedler claims he did; the legal mail continued to be passed out as usual because there WAS no incident.

The legal mail in question was searched without cause or suspicion of illegal activity, violating Mr. Ransberger's privilege to confidential mail when addressing certain issues at the lower institutional level.

The mail that was intercepted was a medical document that was essential for Mr. Ransberger to file a grievance regarding his existing medical conditions, and this delayed his process, which exacerbated the situation due to grievance procedural time limitations. *See* Grievance #407-1909-0004.

The other piece of mail intercepted and read by Fiedler was the sexual abuse mail that was bound for Tallahassee as a third-party grievance, a piece of mail that is also privileged and protected.

When Fiedler read this mail, she mocked Mr. Ransberger and told him that he was never going to win that grievance because no one was going to believe him.

While other inmates were allowed access to the warehouse to pick up their legal mail after work as permitted by staff for years, Mr. Ransberger was the only one that was denied access after the fake DR incident discussed above.

Since Mr. Ransberger exercised his right to participate in the grievance process, the mail officials all denied him access to the warehouse office to get his legal mail like everyone else, which also corroborates these officials singling him out.

Even though Mr. Ransberger plead not guilty to the DR, he was still placed in confinement, and no formal investigation was ever conducted into the falsity of Fiedler's accusations, despite Mr. Ransberger's repeated attempts to inform higher-ups of what happened.

During these times, Mr. Ransberger requested lower bunk passes several times due to his existing back problems, and the requests were constantly rejected in each level of his grievances. *See* Medical Grievance Timeline.

Mr. Ransberger explained to Collins that he has a back condition that needs special medical attention, a melanoma issue, asthma, and that he is unable to work outside due to his conditions. *See Id.*

In accordance with Collins answer, Mr. Ransberger began another medical paper trail by exhausting the grievance process to inform everyone about his medical conditions. *Ibid.*

In response to these requests and grievances, Baker from medical did nothing to accommodate Mr. Ransberger's requests, and made errors when explaining the diagnosis concerning his current back conditions in the grievance response (lumbar spondylosis and chipped vertebrae) when reviewing his medical records. *Ibid.*

Mr. Ransberger also requested to pay for a back brace out of his pocket, and requested his documents to send them out to his own specialist; they also delayed this request for no reason, and still did not allow him to pay for his own back brace. *See* Medical Grievance Timeline.

Baker never corrected his own mistake (claiming that they saw no chipped vertebrae in x-ray), and Mr. Ransberger remained working on outside work squads and sleeping on top bunks, without regards to his medical conditions. *See* Grievance Log# 407-1907-0011,1908-404-022.

Baker knew of his mistake and failed to correct it, thus surpassing the negligence threshold to reckless disregard for Mr. Ransberger's health problems.

Bhadja also never gave Mr. Ransberger permission to purchase a back brace with his own money. *See* Grievance Appeal# 19-6-3288/1908-404-085.

As for the smoke issue, Mr. Ransberger suffers from asthma and chronic interstitial lung disease, conditions that are exacerbated by the smoking in the dormitory he has been located in.

On 7/2/19, when Mr. Ransberger wrote an inmate request grieving this smoking issue to Warren, she simply told him to bring the smoking problem to the dorm officers' attention. *See* 7/2/19 request form, medical grievance timeline.

Completely disregarding the fact that he would be retaliated on if he snitched on the inmates smoking in the dorm, Warren failed to take Mr. Ransberger's safety in to account and directed him to implicate himself in front of inmates to address the smoking problem in the dorm. *See* Medical Grievance Timeline.

Shortly after the request to Warren, made an announcement to all the inmate work squads coming into the sally port after work, saying that "if yall know anything inmate Ransberger getting picked on or harassed, come forward and let me know."

Knowing well how prisoners think, Warren did this to expose Mr. Ransberger's current litigation attempts against staff, which also caused multiple threats from the fellow work squad inmates to force him to stop writing grievances due to fear of retaliation from officers.

At Warren's direction, Mr. Ransberger attempted to notify Hawk of the smoking during the night shift, and she did not answer his repeated calls from the officer station window as he gestured the smell of smoke with his hands.

Since Mr. Ransberger's bunk is located directly in front of the officer station, he refrained from attempting to speak to Hawk any further because inmates were threatening to attack him if he did not get off the officer's window. *See* Ransberger Aff.,

The smoking problem has added to Mr. Ransberger's asthmatic condition, chronic breathing problems and has caused him to get sick from the constant ingestion of tobacco and drug smoke. *See* Exhibit B, Trident Care Imaging Radiology Document.

After bringing this smoking issue to Warren and seeing that no resolution occurred, Mr. Ransberger put in a sick call for his asthma problem because he could not take it anymore, so he brought this smoking issue to the medical staff's attention.

Additionally, in attempts to evade retaliation by inmates in the dorm, Mr. Ransberger went up the chain of command with the smoking issue by filing an appeal, and Scott denied it.

However, she also stated in her reply that "staff nor inmates should not be smoking in the dorm... you should address the issue with medical if your issues are uncontrollable..." Despite knowing this ongoing situation, she did nothing, and nothing was ever done by anyone. *See* Exhibit C, Formal Grievance Response Log # 2005-404-177.

Being that the grievance was directed to the Warden's Office, even though Scott answered, it is clear that Severson was advised of the smoking issue, had actual knowledge of it, and failed to take action by directing Scott and the rest of the staff to address the problem, thus establishing supervisory liability to the matters at bar.

After repeated attempts to bring the smoking issue to correctional staff's attention, Mr. Ransberger's health has deteriorated rapidly due to the constant inhalation/ ingestion of smoke; this has forced him to put in sick calls and take medical emergency action. *See* Medical Grievance Timeline.

Mr. Ransberger constantly experiences constant nausea, sleeplessness, dizziness, and complications with his respiratory system daily, thus evincing an imminent fear of danger to his health, severe respiratory complications, and/or death.

Most recently, the COVID-19 pandemic is being treated as if it were nothing at the work camp; multiple officers do not wear their masks as required by CDC, do not allow inmates to practice social distancing while at the chow hall, and do not provide any sanitizer, bleach, and/or extra chemicals to keep the housing area clean.

In fact, inmates are only given (1 roll of toilet paper and 1 small soap bar) once every Wednesday night, and are vulnerable to any correctional officer's negligent careless behavior for not wearing their masks while working at the work camp; each officer's reckless disregard for the inmates safety from contracting COVID-19 by not wearing their masks is caught on video. *See, e.g.*, Daytime and Nighttime Dormitory Surveillance Videos, from 4/1/20 – 7/1/20, any of the 3 dorms.

Up to last week, and only after multiple staff members caught COVID-19, they finally decided to test every inmate, and Mr. Ransberger's dorm is now on quarantine because multiple inmates tested positive for COVID-19.

The inmates that tested positive were literally a few feet away from Mr. Ransberger's bunk, evincing the complete risk he is subjected to as the days go by at the work camp.

Mr. Ransberger was also sexually assaulted by Aguilar, Whitlon, and Anglin while being stripped searched coming from work, and while going to church services.

These 3 officers repeatedly and forcefully thrusted Mr. Ransberger's scrotum with their hands while performing searches on inmates. *See* Grievance 3-6-19 raising sexual abuse issue.

Many inmates also suffered the same sexual harassment and submitted affidavits in support of this claim but were too scared to submit grievances at the institutional level. *See* Exhibit E, Sworn Affidavits 1-9, inmates at the work camp, *et.al*.

Aguilar, Whitlon, and Anglin even made many of these inmates, including Mr. Ransberger, defecate in buckets, claiming that they were performing cavity searches for narcotics and contraband. *Ibid.*

CLAIMS FOR RELIEF

## COUNT 1- VIOLATIONS OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

When Fiedler intercepted Mr. Ransberger's mail, opened it and read it, she violated his constitutional right to be free from interference with his privileged mail, his right to PREA mail, and his freedom of protected speech. U.S. CONST. AMEND. 1

The actual injury from Fiedler's actions was the inability to forward important medical information to corrections in time to aid the requests for Mr. Ransberger's health problems, competent access to direct mailing of the sexual abuse grievance to Tallahassee, and delaying the time to respond for grievance procedures to evade being procedurally barred from relief.

Both issues impeded the grievance process which caused further mental and physical harm, and directly interfered with Mr. Ransberger's right to exercise his freedom of speech without fear of retribution or retaliation. *Id.*

Where Fiedler opened and read a sexual assault grievance sealed for the purpose of being mailed to Tallahassee as a third-party grievance regarding sexual abuse,

she knowingly and purposely tampered with privileged mail to impede the investigation, and to inform the officers involved of Mr. Ransberger's attempts to expose their actions to higher-ups.

When Mr. Ransberger participated in the prison grievance process, all these officers began to retaliate on him by changing his job duties, subjecting him to abusive searches, and ignoring his pleas for protection from other inmates that threatened to hurt him if he continued writing officers up.

There were other orderly positions available that various civilian correction staff members requested for Mr. Ransberger to be assigned to, ranging from maintenance and the tool room to education orderly.

Each position was denied by classification without any reasonable explanation, evincing a conspiracy amongst each of the staff members listed above to give Mr. Ransberger a hard time for exercising his right to file grievances.

Mr. Ransberger was also transferred from g dorm at the main unit back to the work camp after these grievances were submitted, a dorm specifically created for people 55 years of age and over.

Immediately after the grievances started, Mr. Ransberger also lost his orderly job as a teacher in a business startup class and his outside gate pass was revoked.

A request form to education requesting to be placed as an education orderly was returned blank without signature from Ms. Phelps, unlike the first ones, in order to circumvent Mr. Ransberger's efforts to obtain the job. *See* Exhibit E, requests to Ms. Phelps for education orderly position.

Mr. Looney also requested for Mr. Ransberger to be placed on the motor pool squad as his job assignment, which was also rejected by Collins.

Ms. Schulz, the compass teacher, also admitted to Mr. Ransberger that Collins did not let Mr. Ransberger be her orderly to teach the GED class.

Additionally, Mr. Ransberger's requested transfer to sago reentry was canceled or blocked, after specifically signing up for it and being approved. *See* Exhibit F, request to Collins inquiring about reentry eligibility status; *see also* classification timeline.

Not only is retaliation a constitutional violation, but it is also "reprisal" within the meaning of chapter 33.[3]

The 3 elements of a retaliation claim are satisfied: (1) Mr. Ransberger engaged in his constitutional right to participate and exhaust the grievance process concerning his ongoing issues, (2) [multiple] adverse actions happened simultaneously that deterred Mr. Ransberger from continuing to engage in that conduct, and (3) the causal connection between the both elements one and two is that if it wasn't for Mr. Ransberger's actions in filing grievances, the officers (Campbell, Warren, Fielder, Robbins, Collins and Bevis) would have never conspired to retaliate against him for exposing their actions in response to his grievances. *See Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 275-77 (1977).

These adverse incidents were not coincidental- a regular inmate would not have been rejected from so many viable opportunities to be a helpful productive inmate if it were not for the conspired, retaliatory motives behind the scenes, working to disrupt Mr. Ransberger's constructive agenda.

The 4 prongs of a conspiracy are satisfied in this case where: (1) a conspiracy existed amongst Campbell, Collins, Warren, Fielder, Robbins, and Bevis to (2) retaliate against Mr. Ransberger for writing grievances that exposed their retaliatory efforts, which (3) prompted all 5 of them to falsify and omit documents to place Mr. Ransberger in confinement and keep him from exercising his right to exhaust the grievance procedure, and (4) the injuries were placing Mr. Ransberger in confinement without cause, delaying his exhaustion attempts pursuant to PLRA to be able to petition this honorable court, delay a speedy response to Mr. Ransberger's sexual abuse grievance that he attempted to mail out as a third party grievance straight to Tallahassee (as allowed by chapter 33), and blatantly ignore the constant ingestion of smoke in the dorm that Mr. Ransberger advised staff of where smoking takes (and continues) to take place, which has caused major health and respiratory complications for Mr. Ransberger, *inter alia*.[4]

No other legitimate, penological reasons existed to subject Mr. Ransberger to all these repercussions; he never had any DR's, was never a problematic inmate, and

---

[3] *See* Ch. 33.103.017, Reprisal.
[4] *See* 42 U.S.C. 1985 (2).

had good recommendations from multiple staff members. *See, e.g.,* Exhibits G, H, and I, recommendation letters from correctional staff members praising Mr. Ransberger's good conduct and hard work ethic.

## COUNT 2- VIOLATIONS OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION

When Mr. Ransberger informed Collins, Bhadja, Baker, Warren, and Scott of his existing medical conditions (back injury, asthma, and smoking problem in the dorm), they acted with deliberate indifference in failing to take action by removing him from the dorm, from strenuous labor, and for delaying proper asthma treatment for his lung condition when they knew he had a serious lung condition all along.

Where Warren knew of Mr. Ransberger's back condition, and it was documented in the grievance process, she had the power to issue a lower bunk pass and refrained from doing so due to Mr. Ransberger's consistent filing of grievances.

Warren exhibited deliberate indifference for failing to act logically and place Mr. Ransberger in a lower bunk, subjecting him to further unnecessary straining.

Where Baker and Bhadja also knew of Mr. Ransberger's back problems and failed to communicate the severity of the issue to Collins and Warren, they both acted in concert with Collins and Warren in exhibiting deliberate indifference to Mr. Ransberger's nearly handicapped condition.

Where corrections and medical staff were put on notice that Mr. Ransberger's mother suffers from melanoma, and has skin lesions on his head, they acted deliberately indifferent by ignoring his pleas for a hat pass and a job out of the direct sunlight. See 6/25/14 request for hat pass and sunscreen.

By leaving Mr. Ransberger on labor outside work squads after confirming his back, asthma, and lung condition, Collins acted and continues to act deliberately indifferent to his medical conditions.

Where Aguilar, Whitlon, and Anglin all thrusted Mr. Ransberger's scrotum during strip searches maliciously and sadistically, in a manner meant to cause wanton infliction of pain, all 3 officers exhibited cruel and unusual punishment through these sexual acts.

Where Siegler was notified of Mr. Ransberger's medical conditions and denied his grievance appeal, he ignored serious existing medical problems, thus exhibiting deliberate indifference.

Where Hawk and Warren knew of the smoking issue and continued subjecting Mr. Ransberger to constant exposure of tobacco and drug smoke after being put on notice of the issue in a discreet fashion to avoid being labeled a snitch, this also exhibits deliberate indifference to his asthma and chronic lung condition.[5]

Where Scott knew of the smoking issue and specifically responded that she would look into it, then instructed Mr. Ransberger to take it up with medical, exhibits actual knowledge of the smoking situation affecting Mr. Ransberger, and deliberate indifference for failing to take action to stop the smoking in the dorm.

Since Warren and Scott are responsible for contacting dorm officers to inform them to stop the smoking issue, this established supervisory liability of this ongoing issue for having knowledge of this issue and failing to instruct dorm officers to regulate the dorm as required by chapter 33 to provide a smoke free environment.

The objective serious medical need in this case is Mr. Ransberger's chronic interstitial lung condition, his back problems, and his asthma.

These health problems discussed above fall within the parameters of a "serious medical need" due to each of Mr. Ransberger's diagnosis regarding the same. *See, e.g.,* Doctor's response to Back Pain Grievance, *et.al.*; Medical Grievance Timeline.

Instead of moving Mr. Ransberger out of the dorm after being put on notice of the smoking issue, medical and correctional officers merely prescribed an asthma inhaler after Mr. Ransberger put in a sick call due to his condition worsening from the ingestion of smoke.

---

[5] To be specific, bunk#2,3,6,8,14,15,39,46 and others are the bunks utilized to smoke right in front of the cameras And no one ever does anything about it.

This shows they all took a less efficacious course of treatment because the real problem behind all this is the constant ingestion of smoke, an issue yet to be resolved that has passed the imminent fear threshold and turned into permanent damage and/or soon to be fatal as a result thereof. *See* Exhibits J and K, sworn affidavits of Valerie Sader and Joan Ransberger.

This continued disregard of Mr. Ransberger's ingestion of smoke *per se* constitutes deliberate indifference and constitutes a credible fear of imminent fear of danger/ continued permanent damage and/ or death.

Robbins subjected Mr. Ransberger and her work squad inmates to excessive labor **without** allowing them to drink water or go to the bathroom as needed, which exhibits deliberate indifference and constitutes cruel and usual punishment.

Furthermore, the work camp's grossly inadequate preparation for the COVID-19 pandemic has subjected Mr. Ransberger to the possibility of death daily at any time due to the continued exposure to inmates AND correctional officers that already have the virus.

Additionally, the work camp did not test inmates or officers unless they are showing symptoms of COVID-19, another issue that has allowed inmates and officers that are positive for COVID-19 to go undetected, thus silently infecting everyone around them.

The inmates sometimes go the whole weekend without chemicals to clean the dorms, bathrooms and showers because the caustics officer (Defendant Doe) does not provide enough chemicals for the weekend before he is gone from Friday to Monday.

There are no logs to prove that inmates are getting the materials they need to maintain the hygiene at the work camp; all these issues remain unaddressed and disregarded.

The masks being provided for the inmates are not real surgical masks, and do not provide the same protection that real surgical masks provide.

Instead of buying inmates the correct surgical masks, staff at Okeechobee prisons choose to have inmates make facial cloth coverings out of the same prison blues material in attempts to save money and circumvent requirements.

Campbell possesses supervisory liability since he is the outside squad lieutenant and fails to enforce CDC guidelines by instructing work squad officers and inmates going out to work to mask up properly- this carelessness also constitutes deliberate indifference, and cannot be considered mere negligence due to the severity of the COVID-19 pandemic.

Not once have inmates been given hand sanitizer or extra chemicals to stay clean, and the masks provided by staff to protect inmates from COVID-19 are grossly inadequate- there is even a shortage of gloves for inmates to clean the dorms.

Campbell and Severson also possess supervisory liability for failing to keep all inmates from going out to work while the COVID-19 is at its peak, because they don't want to lose their business contracts with local employers that hire DOC for inmate work squads.

Whitlon and Aguilar both also do not enforce other officers to wear their masks as they work on the compound, and do not enforce social distancing at the chow hall (as required by the CDC and Tallahassee), thus establishing supervisory liability and exhibiting deliberate indifference to the risk of inmates being contaminated by the virus.

Each official listed above had: (1) subjective knowledge of Mr. Ransberger's medical conditions and the viability of the harm, (2) they each disregarded that those risks, and (3) these reckless actions were not mere negligence, but conscious decisions calculated to ignore Mr. Ransberger's repeated pleas for assistance.[6]

The policies and customs of Okeechobee County, the Florida Department of Corrections staff, Centurion, and Chapter 33 caused and continues to cause Mr. Ransberger physical and mental harm.

These policies and customs allegedly forced medical staff and corrections officers to keep Mr. Ransberger on a top bunk because of "profile comparisons," and cleared Mr. Ransberger for labor on outside work squads when he has lung disease and back problems that prevent him from performance in any kind strenuous labor.

---

[6] See Farmer v. Brennan, 511 U.S. 825,844 (1994).

The municipalities policies and customs followed by the officers and medical staff in Okeechobee County constituted deliberate indifference to Mr. Ransberger's constitutional rights, and disregarded Mr. Ransberger's ongoing medical and safety issues.

The circumstances adduced on the record discussed above manifest a credible imminent fear of danger that continues to harm Mr. Ransberger, and poses a serious threat of death and irreversible damage if not addressed *instanter*, and warrants injunctive relief to protect Mr. Ransberger from any further harm or retaliation (especially after all defendants involved in this lawsuit receive this complaint).

## COUNT 3- VIOLATIONS OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

It is well established that the First and Eighth Amendments are applied to the states through the Fourteenth Amendment, and where a plaintiff's constitutional safeguards are violated, the Due Process Clause of the Fourteenth Amendment is also violated *pariter.*

In this case, multiple instances of singling Mr. Ransberger out and treating him differently in a retaliatory manner for exhausting the grievance procedure is tantamount to a deprivation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Additionally, where all the defendants listed above deprived Mr. Ransberger of specific medical treatment, safe haven from the smoking issue in the dorm, any possible retaliation by officers and inmates, and any jobs to accommodate his ongoing health issues, they also violated his Due Process rights to equal treatment like any other regular inmate would receive, as guaranteed by the constitution.

Additionally, where other inmates across the United States are being released even though they are federal inmates, the virus affects (every inmate), including

state inmates the same way:  this warrants equal protection and violates the Fourteenth Amendment for being prohibited the same relief when Mr. Ransberger meets the same criteria that those federal inmates met outlined by the CDC and BOP for early release, and is directly in the presence of the virus without protection.

The cumulative effect of all these issues discussed above violate due process of law *in toto.*

## RELIEF REQUESTED

WHEREFORE, Mr. Ransberger requests that this honorable court grant the following relief:

A. Issue a declaratory judgment stating that:

1.The physical abuse of defendants Whitlon, Aguilar, and Anglin violated Mr. Ransberger's rights under the Eighth Amendment of the United States Constitution and constituted an assault and battery under state law.

2.Defendants Baker and Bhadja's actions in failing to provide adequate medical care by issuing the proper diagnosis and passes for Mr. Ransberger exhibited deliberate indifference to his health problems, violated and continues to violate Mr. Ransberger's rights under the Eighth Amendment to the United States Constitution.

3.Defendants Campbell, Fiedler, Warren, Bevis, and  Robbins all conspired to place Mr. Ransberger in confinement through falsified allegations after Mr. Ransberger wrote  grievances on them on 8/8/19, and carried out their plan, which ultimately ended up as a retaliatory action in violation of Mr. Ransberger's First Amendment rights of the United States Constitution.

4.Defendants Scott, Warren, and Hawk all exhibited deliberate indifference in ignoring Mr. Ransberger's pleas to resolve the smoking issue in the dorm,

and this has caused and continues to cause Mr. Ransberger irreversible lung damage that is fatal to his health, thus violating Mr. Ransberger's Eighth Amendment Rights to the United States Constitution.

5.Okeechobee County is liable as a governmental entity for establishing the policies that corrections and medical staff followed that violated Mr. Ransberger's Eighth Amendment Rights of the United States Constitution, and for its reckless handling of the COVID-19 disease for failing to take adequate precautionary measures to protect the vulnerability of inmates confined in their prisons.

6. All defendants listed above violated Mr. Ransberger's right to equal protection and due process, thus violating his Fourteenth Amendment Rights.

B. Issue an injunction ordering the department of corrections and its agents to:

1.Immediately transfer Mr. Ransberger from Okeechobee Work camp to another prison away from any further possible retaliation, away from the smoking that is fatally taking a toll on his health in the dorm, away from other inmates and officers that can possibly have COVID-19 and remove him off any labor work squads that exceed his physical abilities due to his back, asthma, skin, and lung problem.

2. Weigh any possible threat (no record, first time offender) to society in Mr. Ransberger's DOC record against his remaining time left, release him on home detention in accordance with his ongoing medical issues, and consider any other such reductions and commutations of sentence with his good conduct in consideration.

3.Expunge all disciplinary records described in this complaint from Mr. Ransberger's institutional record.

4.Allow discovery to proceed to expose any other possible John Does involved.

5. Enter an order compelling correctional staff to provide efficient masks, sanitizer, extra chemicals and materials to enable all inmates at the Okeechobee Prisons to maintain a clean, uninfected living environment.

C. Award compensatory damages in the following amounts:

1.$100,000 jointly and severally against defendants Warren, Hawk, Scott, Siegler,Doe and Severson, for the physical and emotional damage inflicted by their action's reckless response to the smoking issue that has and continues to cause physical and emotional harm on Mr. Ransberger.

2.$50,000 jointly and severally against defendants Whitlon, Aguilar, and Anglin for the physical and emotional injury they caused when they performed their sexually abusive searches on Mr. Ransberger and other inmates.

3.$50,000   jointly and severally against Bhadja and Baker for the physical and emotional injury resulting from their failure to issue medical passes for a permanent lower bunk, no direct sun, and no labor to Mr. Ransberger in an effort to aid his health problems.

4.$50,000 jointly and severally against Warren, Fiedler, Bevis, Robbins, and Campbell for their retaliatory actions intended to interfere in Mr. Ransberger's freedom of speech to exhaust the grievance process and bring these causes to this court.

5.$50,000 solely to defendant Doe for failing to equip the inmates with extra chemicals to kill the virus in the dorms, and failing to provide surgical masks instead of the cloth facial coverings.

6.$1,000,000 solely against Okeechobee County for promulgating the policies and customs followed by all the defendants that are unconstitutional and violated Mr. Ransberger's rights under the First, Eighth, and Fourteenth Amendments.

D. Award punitive damages in the following amounts:

1. $10,000 each against defendants Severson, Scott, Warren, and Hawk;

2. $10,000 each against defendants Campbell, Fiedler, Bevis, and Robbins;

3. $10,000 each against Bhadja and Baker;

4. $10,000 each against Aguilar, Whitlon, and Anglin.

5. $10,000 each against Siegler, Collins, and Doe.

E. Award nominal damages against each defendant in this complaint.

## CONCLUSION

WHEREFORE, Mr. Ransberger respectfully requests for this honorable court to grant the relief requested herein, grant the injunction, and any other relief that the court deems fitting and proper, in the interest of justice*

I HEREBY CERTIFY that the foregoing complaint is sworn to by me, read by me, and that everything is true and correct to the absolute best of my knowledge and belief. I also confirm the veracity of all this under the penalty of perjury, 28 U.S.C. 1746.

RESPECTFULLY SUBMITTED,

Joseph Ransberger, *Pro se, Ad hoc, et.al*

Okeechobee Work Camp #W40148

3420 NE 168 ST

Okeechobee, FL    34972

X_____



JONATHAN LOPEZ
(305) 965-2798
THE UPS STORE #5452
1581 W 49TH ST
HIALEAH  FL 33012-2924

3 LBS          1 OF 1
SHP WT: 3 LBS
DWT: 13,10,7
DATE: 20 AUG 2020

SHIP FORT PIERCE CLERK OF COURTS
TO:  RM 1016
     101 S US HIGHWAY 1

FORT PIERCE  FL 34950-4209

FL 349 1-01

UPS GROUND
TRACKING #: 1Z W69 93Y 42 4418 1219

BILLING: P/P
SIGNATURE REQUIRED

REF #1: 8/20 YR

REF #2: 5452

ISH 13.00M ZZP 456 31.5U 07/2020